**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PARKER-HANNIFIN CORP. and** | ) | **CASE NO. 1:06-CV-2616** |
| **PARKER INTANGIBLES LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **CHAMPION LABORATORIES, INC.** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon defendant's motion for clarification and for

reconsideration (Doc. 54) and plaintiffs' motion to strike exhibits 2-7 to defendant's

memorandum in support of its motion for clarification and for reconsideration (Doc. 55).  This is

a patent infringement suit.  For the reasons that follow, defendant's motion for clarification and

reconsideration is GRANTED in PART and DENIED in PART.  Plaintiffs' motion to strike is

GRANTED.  Defendant is ordered to submit within ten days of issuance of this Order a

calculation of the simple interest for each damages period at the rate provided for in Ohio Rev.

Code § 5703.47 including a statement of (1) the number of infringing units sold per year during

both the Provisional Rights Period and the Infringement Period; (2) the interest rate used; and (3) the basis for determining that interest rate.

The Court's earlier Damages Opinion (Doc. 53) is also hereby modified.  Plaintiffs are awarded a reasonable royalty for the provisional rights period in the amount of $203,524.

**FACTS**

Only those facts necessary to a resolution of the present motions are set forth below.

Defendant has conceded that its LP2017 oil filter element infringes at least one claim of U.S. Patent No. 6,983,851 ("the '851 Patent").  The parties previously asked the Court to determine the proper quantum of damages, based on a reasonable royalty, for the provisional rights period of the '851 Patent.  The parties also asked the Court to determine the proper measure of damages - either a reasonable royalty or lost profits - for the infringement period and the quantum of such damages.  In an Opinion dated April 22, 2008 (the "Damages Opinion"), the Court awarded plaintiffs $86,500 for the provisional rights period.  Doc. 53.  The Court further awarded plaintiffs their lost profits in the amount of $543,982 for the infringement period.  *Id.* The Court also ordered defendant, for purposes of determining the prejudgment interest due, to submit a calculation of the simple interest for each damages period at the rate provided for in Ohio Rev. Code § 5703.47 including a statement of (1) the number of infringing units sold per year during both the Provisional Rights Period and the Infringement Period; (2) the interest rate used; and (3) the basis for determining that interest rate.  *Id.*

Defendant now moves for clarification and reconsideration.  Plaintiffs move to strike several exhibits submitted with defendant's motion.  Each motion is opposed.[1]

---

[1]

Defendant did not actually file an opposition to plaintiffs' motion to

2

**DISCUSSION**

I.      **Motion for Clarification**

At pages 27-28 of its Damages Opinion, the Court stated:

> The Court agrees with defendant that, if interest is to be awarded, the interest should not be calculated on the full amount of damages from the beginning of each of the damages periods and that the interest rate should be determined by the statute.  However, defendant fails to provide the Court with a calculation of the interest under its preferred formulation.  Accordingly, defendant is hereby ordered to submit within ten days of issuance of this Order a calculation of the simple interest for each damages period at the rate provided for in Ohio Rev. Code § 5703.47 including a statement of (1) the number of infringing units sold per year during both the Provisional Rights Period and the Infringement Period; (2) the interest rate used; and (3) the basis for determining that interest rate.

The Court also stated, in its conclusion, "Defendant is ordered to submit a calculation of prejudgment interest as detailed above."

However, at page two, the Court inadvertently stated that "the Court declines in its discretion to award prejudgment interest."  It is because of the conflict between the Court's pronouncements that defendant seeks clarification.

Defendant's motion for clarification is granted.  The statement on page two was made in error.  The Court reiterates that defendant is ordered to submit a calculation of prejudgment

_____

strike.  What defendant did file was a document styled "Reply to response to [55] Motion to strike Exhibits 2-7 ..." (Doc. 57).  A "reply" is typically a document filed in support of one's own motion, and defendant's "reply" does go to the merits of its motion for reconsideration.  However, defendant's "reply" does also address - in part - the merits of plaintiffs' motion to strike.  Defendant presents arguments regarding Exhibits 4 and 6.  The Court will give defendant the benefit of the doubt and treat defendant's reply as both a reply in support of its motion for reconsideration and an opposition to plaintiffs' motion to strike.

3

interest as detailed at pages 27-28 of its Damages Opinion.

**II.      Motion for Reconsideration**

The Federal Rules of Civil Procedure do not provide for motions for reconsideration. "Instead, such motions, if served within ten days of entry of judgment, are considered motions to alter or amend judgments pursuant to [ ] Rule 59(e)." *Stubblefield v. Truck Stops Corp. of Am.*, 117 F.3d 1421 (6th Cir. 1997) (citing *Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir. 1982)). "Generally, there are three major situations which justify a court reconsidering one of its orders: 1) to accommodate an intervening change in controlling law; 2) to account for new evidence not available at trial; or 3) to correct a clear error of law or to prevent a manifest injustice." *Hancor, Inc. v. Inter American Builders Agencies*, 1998 WL 239283 (N.D. Ohio March 19, 1998) (citing *In re Continental Holdings, Inc.*, 170 B.R. 919, 939 (Bankr. N.D. Ohio 1994)). The ten-day filing period is jurisdictional in nature, and any motion to reconsider filed outside this time frame is of no effect. *Feathers v. Chevron, U.S.A., Inc.*, 141 F.3d 264, 268 (6th Cir. 1998).

A motion to reconsider filed more than ten days after the entry of judgment is treated as a motion for relief from judgment under Rule 60(b).

> The standard for granting a Rule 60 motion is significantly higher than the standard applicable to a Rule 59 motion. A timely Rule 59 motion may be granted "for any of the reasons which rehearings have heretofore been granted in suits in equity in the courts of the United States." A Rule 60(b) motion, by contrast, may be granted only for certain specified reasons ...

*Id.* Rule 60(b) provides that relief may be granted only for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence which by due diligence could not have

4

been discovered in time to move for a new trial under Rule 59(b);

(3) fraud, misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b).

Defendant contends, in its motion for reconsideration, that the Court misplaced the burden of proving whether plaintiffs are entitled to an award of their lost profits for the time defendant admits it infringed the '851 Patent.  While defendant's motion fails to state the basis for its request for reconsideration, in its reply brief defendant states a "manifest injustice" will be done if the Court's prior ruling is left to stand.  Defendant's motion was filed within ten days of this Court's Damages Opinion.  Therefore, the motion for reconsideration will be treated as a motion pursuant to Rule 59.

In its Damages Opinion, the Court was required to determine whether or not plaintiffs were entitled to a reasonable royalty or lost profits as a measure of their damages for defendant's patent infringement.   The Court's task in determining the measure of damages is to decide what will adequately compensate for the infringement.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964).  In doing so, the Court looks to what the patentee would have had if the infringer had not infringed.  *Id.*  A reasonable royalty, by statute, is simply the minimum measure of damages - a baseline.  35 U.S.C. § 284.  However, if a reasonable royalty would fail

5

to adequately compensate for the infringement, the Court may award lost profits. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). To recover lost profits damages, the *patentee* must show a reasonable probability that, "but for" the infringement, it would have made the sales that were made by the infringer. *Id.*

Courts apply a four-factor test in determining whether to award lost profits damages. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978); *Rite-Hite*, 56 F.3d at 1545 (citing *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989)). The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made. *Panduit*, 575 F.2d at 1156.

> A showing under *Panduit* permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's *prima facie* case with respect to "but for" causation. A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. The patentee need only show that there was a reasonable probability that the sales would have been made "but for" the infringement. When the patentee establishes the reasonableness of this inference, *e.g.*, by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales. The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales.

*Rite-Hite*, 56 F.3d at 1545. Plaintiffs need only establish this "but for" causation by a preponderance of the evidence. *Yarway Corp. v. Eur-Control U.S.A., Inc.*, 775 F.2d 268, 275 (Fed. Cir. 1985).

Defendant's motion for reconsideration centers on the Court's determination that

6

plaintiffs proved the absence of acceptable, available non-infringing substitutes.  The Court's decision turned on the lack of evidence that the alleged substitutes were available and a declaration implying they were not.

In its merit brief on damages, defendant asserted there were five acceptable, available non-infringing alternatives:  (1) defendant's own Core Adapter; (2) filter #57314 by Wix Filtration Corporation; (3) filter #L45515 by Purolator; (4) filter #P7235 by Baldwin; and (5) "knock-off" filters imported by various "Asian" manufacturers.  Defendant's motion for reconsideration is directed solely to the "availability" of the Baldwin, Wix and Purolator filters.

In its earlier Damages Opinion, the Court correctly stated that:

> If the *plaintiff* establishes that the alleged alternative was not actually on the market during the infringement period, the burden shifts to the accused infringer to show that the substitute was available.  *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999).  "Mere speculation or conclusory assertions will not suffice to overcome the inference.  After all, the infringer chose to produce the infringing, rather than noninfringing, product.  Thus, the trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement."  *Id.*

Doc. 53 at 14-15 (emphasis added here).

The Court then went on to state:

> As for the Wix, Baldwin and Purolator filters, there appears to be no dispute that none of these filters were actually on the market when the Infringement Period began.  Plaintiffs state they held 100% of the market before defendant began infringing and defendant does not dispute this fact.  Thus, the burden shifts to defendant to demonstrate that at least one of these substitutes was available during the infringement period.  Defendant has failed to do so.  Defendant offers no evidence of when these filters actually were introduced, providing the Court with no basis to find the filters were or could have been available.  Thus, the Court finds that the Wix, Baldwin and Purolator filters were not available during the Infringement Period.

7

Doc. 53 at 15-16.

Defendant now argues that the following finding of fact was in error:  "Plaintiffs state they held 100% of the market before defendant began infringing and defendant does not dispute this fact."  Defendant argues that but for this finding the Court would not have shifted the burden to defendant to show that the substitutes were actually available during the infringement period. This finding was based upon an affidavit by Kathy Edge, Marketing Manager for the Racor Division of Parker-Hannifin Corporation.  Ms. Edge declared that "Parker remained the only producer of oil filters for these engines until infringers appeared on the market."  Defendant argues that these "infringers" included the Wix, Baldwin and Purolator filters.  That is, these substitutes were available and on the market before defendant began infringing.

Defendant also now points out that plaintiffs' own documents - that were not before the Court when it was considering the parties' merit briefs - establish that the substitutes were, in fact, on the market.  Plaintiffs move to strike this new evidence.  Plaintiffs also argue that even if the Wix, Baldwin and Purolator filters were "available," they are not "non-infringing."

First, the Court agrees with plaintiffs that defendant's new evidence is not properly before the Court.  This new evidence consists of exhibits 2 - 7 submitted with defendant's memorandum in support of its motion for reconsideration.  Plaintiffs' motion to strike exhibits 2 - 7 is granted.

The Court also finds that reconsideration is not warranted in this case.  The question of whether the substitute filters were "available" is not necessarily dispositive of the question of

8

whether plaintiffs are entitled to lost profits.[2]  Even if plaintiffs cannot show that the substitutes were not available, plaintiffs may still prevail on their theory of recovery by showing that the substitutes were infringing.

In the briefing on the merits, plaintiffs proffered the expert testimony of Dr. Garris as to whether the Wix, Baldwin and Purolator filters infringed certain patents.  Dr. Garris opined that the Baldwin filter infringes claim 24 of the '851 Patent - the patent at issue in this suit.  He also opined that the Wix filter infringes claims 1, 2, 3, 6, 7, 8, 9, 11, 16, 17, 18 and 19 of U.S. Patent No. 6,986,426 ("the '426 Patent") and that the Purolator filter infringes claim 16 of the '426 Patent.  Significantly, Dr. Garris did not opine that either the Wix or Purolator filters infringe the '851 Patent.

Defendant first argues that this Court may not make a collateral finding of infringement as to the substitutes that are being litigated elsewhere.  Plaintiffs have sued Wix for patent infringement in federal district court in California.  In the Wix litigation, the court declined to grant a preliminary injunction.  Defendant asserts that this Court should be bound by that decision.  The Court disagrees.  As plaintiffs point out, the Federal Circuit has held that a district court may make a collateral finding of infringement even if the question of infringement by the alleged substitute is being litigated elsewhere.  *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820 (Fed. Cir. 1989) (approving a district court's finding as to whether an alleged substitute infringes the patent-in-suit and stating that the district court need not await the outcome of other litigation over whether that substitute infringes the same patent).  Thus, this Court may consider whether

---

[2]
> The Court also notes that, even if defendant's new direct evidence of the availability of the substitutes were considered, the outcome would not be different.

Wix infringes the claims of the patent-in-suit.  Moreover, the California court did not find that Wix did not infringe.  It only found that, at a very early stage of the litigation, plaintiffs had failed to make a strong showing of likelihood of success on the merits such that a preliminary injunction should issue.

Defendant also argues that the Court should only inquire into whether the substitute filters infringe *the patent-in-suit*.  Defendant offers no case law in support of its position.  Instead, defendant merely argues it would be unfair to require it to build a case that these substitutes do not infringe any patent held by plaintiffs.  Plaintiffs counter that defendant brought this burden on itself by suggesting that these third-party filters are non-infringing substitutes.  Plaintiffs also assert that if the substitutes are not legally on the market because they infringe any one of plaintiffs' many patents, then it is reasonable to find that "but for" defendant's infringement, plaintiffs would have captured defendant's sales - the *sin qua non* of the lost profits analysis.

The *Datascope* opinion, discussed above and relied upon by plaintiffs, does not fully answer the question before this Court.  In *Datascope*, the plaintiff attempted to show that the alleged substitute infringed the patent-in-suit, not a different patent owned by plaintiff.  Thus, this Court must still determine if plaintiffs can prevail on a lost profits analysis by showing that an alleged substitute infringes any patent to which they hold the right to enforce.

The Court's own research reveals a single case that is more directly on point.  In *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989), the district court found that defendants infringed U.S. Patent No. 4,447,377 ("the '377 Patent") and granted plaintiff an award of lost profits.  The district court found that "during the period of infringement, all but one

10

of [plaintiff's] competitors in the United States sold foam insulated water heaters made using [plaintiff's] patented method, or one of a strikingly similar configuration, *and/or Denton Patent No. 4,527,543*." *State*, 883 F.2d at 1576 (emphasis added).  In deciding whether or not the trial court properly awarded lost profits, the Federal Circuit stated that "[i]f the court is correct in its finding that the other competitors were likely infringers of one *or the other* of [plaintiff's] patents, [plaintiff] would have been entitled to" lost profits.  *Id.* at 1578 (emphasis added). While failing to address the question directly, the Federal Circuit seems to have tacitly approved the district court's method of determining lost profits.  It thus appears that it is permissible to look to patents not at issue in deciding whether or not third-party products are acceptable, available non-infringing substitutes.

In light of *State*, the Court finds that plaintiffs are entitled to argue that the alleged substitutes infringe patents not at issue here.  This result is not illogical, as defendant would have it.  If plaintiffs need only show a reasonable probability that they would have captured defendant's sales, plaintiffs should be able to do so by demonstrating that other products would not have captured those sales.  That is, if the alleged substitutes infringe any one of plaintiffs' patents, those substitutes are illegally on the market and it would thus be reasonable to conclude that plaintiffs would make those sales instead.

Plaintiffs establish this *prima facie* case of infringement through their expert Dr. Garris. As stated above, Dr. Garris opined that the substitutes from Wix, Baldwin and Purolator each infringe at least one claim in a patent that plaintiffs have the right to enforce.  Instead of offering a rebuttal expert, defendant chose to merely challenge Dr. Garris' opinion with a motion to strike and other attorney argument.  The Court previously denied defendant's motion to strike, stating

11

in part that Dr. Garris "is eminently qualified to opine on the scope of the straightforward claims at issue and whether certain substitutes infringe those claims."  Damages Opinion at 7.  The Court also noted that "defendant failed to proffer its own technical expert opinion to rebut any of the matters considered by Dr. Garris."  *Id.* at n.4.

Plaintiffs need only establish a "reasonable probability" that but for the infringement, plaintiffs would have captured these sales.  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (also stating that patentee need not negate every possibility that a purchaser might have purchased a product other than its own).  The Court finds that plaintiffs have met their burden of showing the absence of available, acceptable, non-infringing substitutes and defendant has failed to rebut that showing.[3]

Accordingly, defendant's motion for reconsideration is denied.

## III.    The *Mars* Case

Plaintiffs have submitted a letter to the Court (Doc. 58).  Attached to the letter is a decision by the Federal Circuit issued June 2, 2008 - several weeks after this Court rendered its Damages Opinion.  *Mars v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008).  Plaintiffs request that, "should the Court reconsider its Order of April 22, 2008, ... plaintiffs respectfully request that the Federal Circuit's opinion in *Mars v. Coin Acceptors*, be considered."  The docket reflects that defendant received the letter; however, defendant failed to respond in any fashion.

In its Damages Opinion, the Court limited plaintiffs' reasonable royalty for the

---

[3]
    Plaintiffs argue that the substitutes, even if they were on the market, were not "available" to defendant in that there is no evidence Wix, Baldwin or Purolator would have been willing to sell their filters to defendant.  The Court need not resolve this question given the showing that the substitutes infringe plaintiffs' patents.

12

"provisional rights period" of infringement to the cost to defendant to implement its non-infringing alternative.  The Court based its decision on the *Grain Processing* district court opinion finding the logic of the district court in *Grain Processing* persuasive.  The Court stated that "the Court agrees with defendant that it would not be willing to pay more than it would have expended to develop a non-infringing alternative."  When *Grain Processing* was appealed, the issue of capping damages was not appealed and, thus, not before the Federal Circuit.  *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999).

In the *Mars* opinion, the Federal Circuit stated that it is "wrong as a matter of law" to state that "reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative."  The *Mars* court then went on to explain, however, that the district court did not err in its analysis.  The trial court actually considered all of the factual considerations surrounding what royalty the parties would hypothetically have arrived at were they to have negotiated one.  The district court adjusted the royalty rate upward based on some of the factors and downward based on others.  The Federal Circuit concluded that:  "Using a calculation methodology that did not limit [plaintiff's] damages to the cost of its least expensive noninfringing alternative was not an abuse of discretion, and the resulting [] royalty rate was not clearly erroneous."

In light of this new opinion, the Court finds it is compelled to revisit its earlier determination that the reasonable royalty for the provisional rights period should be capped by the amount defendant would have spent to design around plaintiffs' patent.[4]  Thus, this Court

---

[4]
> Because the parties fully briefed this issue in their earlier merit briefs, it is not unfair to proceed to resolve the question now and neither party suggests otherwise.

must conduct an analysis pursuant to *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp.

1116 (S.D. N.Y. 1970), and determine what royalty rate two hypothetical negotiators would have

entered into as of the beginning of the provisional rights period.

The *Georgia-Pacific* factors are as follows:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor.
>
> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
>
> 7. The duration of the patent and the term of the license.
>
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> 9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

---

14

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement.

*Georgia-Pacific*, 318 F.Supp. at 1120.

The Court must first determine the date of this hypothetical negotiation.  The provisional rights period began on June 16, 2005.  Plaintiffs' damages expert Mr. Musika contends this would have been the date of the hypothetical negotiation.  Defendant's damages expert Dr. Choi argues that plaintiffs did not receive notice of allowance of the patent from the United States Patent and Trademark Office until September 12, 2005 and, accordingly, this later date is when the negotiation would have taken place.  Dr. Choi fails to state how this change in date might change the royalty that would have been negotiated.  The Court finds that the rate would have been negotiated on the date plaintiffs' rights vested under the Patent Act - June 16, 2005.

Defendant sold 101,762 infringing filters during the provisional rights period.  Plaintiffs' damages expert, Mr. Musika, opines that a reasonable royalty would amount to $2.50 per unit.

15

Such a royalty would lead to a damages award of $254,405.  Defendant's damages expert Dr. Choi opines that defendant would not have been willing to pay more than $86,500 - the amount it spent developing its non-infringing Core Adapter filter.

Mr. Musika arrived at his royalty rate by first "identifying an initial negotiation reference point for both Parker and Champion and then performing a *Georgia-Pacific* analysis."[5]  Thus, the Court begins here as well and discusses these initial reference points before addressing the *Georgia-Pacific* factors themselves.

Mr. Musika explains that "Parker's starting position would be based on its desire to license the rights to the '851 Patent" and "Champion's starting position would be based on the potential income to be gained by taking a license for the lawful use of the '851 Patent." Plaintiffs' reference point in this hypothetical negotiation is influenced by their actual desire to remove infringers from the market.  Plaintiffs have aggressively sought to stop alleged infringers from selling their filters through patent infringement litigation.  Plaintiffs have sued Wix, Baldwin and Purolator for infringement.

Another factor in calculating plaintiffs' starting reference point is the price at which defendant was purchasing filters from plaintiffs prior to infringement.  Mr. Musika calculated the average sale price per unit to be $7.97.[6]  Mr. Musika also calculated plaintiffs' "incremental

---

[5]  Defendant earlier moved to strike Mr. Musika's opinion arguing in part that his identification of this reference point amounted to an unreliable methodology.  The Court disagreed.  Damages Opinion at 9-10 ("The Court finds that Mr. Musika's methodology is reliable.").

[6]  Dr. Choi and defendant complain that this average should include lower priced sales to Wal-Mart.  In denying defendant's earlier motion to strike Mr. Musika's opinion, the Court sanctioned Mr.

profit margin" to be 36.22%.  The resulting estimated "incremental profit per unit" is $2.89.  Mr. Musika thus concludes that plaintiffs' initial reference point for any licensing negotiation would have been this $2.89 per unit they were earning from sales to defendant.

In arriving at defendant's respective reference point, Mr. Musika looked to defendant's "excess profit margin."  Mr. Musika first calculated defendant's "adjusted gross profit margin." He then subtracted from defendant's adjusted gross profit margin its operating expenses.  This provided him with a profit margin for the infringing filters of 53.10%.  Mr. Musika took this number and subtracted from it defendant's "normal product profit margin for all of its products" to arrive at the "excess" profit defendant made on this infringing product.  This excess profit margin amounts to 44.16%.  Mr. Musika then "conservatively estimated that Champion would be willing to pay half, or 22.08%, of this excess margin as a royalty."  Defendant sold its infringing filters, on average, for $6.70.  By taking 22.08% of this sales price, Mr. Musika calculated that defendant's reference point would be $1.48.

Dr. Choi criticizes Mr. Musika's approach.  Dr. Choi opines that to rely on these non-overlapping reference points would be error because no rational hypothetical negotiation could occur if the licensor's minimum acceptable price is higher than the licensee's maximum price. Dr. Choi appears to misapprehend that Mr. Musika's reference points are just that - starting positions.  They are not minimums or maximums.  This is clearly evidenced by the fact that Mr. Musika opines that plaintiffs hypothetically would have agreed to a royalty rate that is below their initial reference point and defendant would have agreed to a rate higher than its initial

_____

Musika's approach to calculating this average sale price.  Damages Opinion at 9-10.  Moreover, defendant fails to provide the Court with any opinion from Dr. Choi on a more appropriate average price.

17

reference point.

Dr. Choi further argues that defendant would not have been willing to sacrifice half of its profit margin to license the patent and, therefore, defendant's initial reference point is too high. He also states that Mr. Musika's reference to defendant's "excess profit margin" was in error. Dr. Choi opines that defendant would have looked only to the profit margin of its filters and not looked at how much the filters outperformed its other, unrelated products.

Dr. Choi opines that the appropriate reference point for defendant would be $ 0.27 per unit. His report does not explain how he arrived at this number.[7] The Court's own calculations reveal that a royalty of $86,500 for 101,762 infringing units would amount to $ 0.85 per unit.

Based upon the opinions of the parties' respective experts, the royalty rate would have been somewhere between $ 0.27 and $2.89 per unit and more likely between $ 0.85 and $2.89.

1.      The royalties received by the patentee for the licensing of the patent in suit

The parties agree that there is no established royalty rate for the '851 Patent. Mr. Musika considers two licensing agreements but dismisses them because he finds they are not relevant. The first such agreement was entered into on March 27, 2007 between plaintiffs and Purolator

---

[7]
      It appears that Dr. Choi's explanation for this 27 cent reference point may be contained in Exhibit 5 to his report. However, the exhibits to his report have not been provided to the Court. Plaintiffs state this number is based on a 1998 license for filters between plaintiffs and Wix under which Wix agreed to pay $1 per unit (this license will be discussed in more detail below when the Court evaluates allegedly similar licenses to determine an appropriate royalty in the instant case). Without more, it is difficult for the Court to put much credence in this $ 0.27 figure.

(the "Purolator Agreement").[8]  The agreement was in settlement of litigation regarding Purolator's alleged infringement of two of plaintiffs' oil filter patents - the '426 Patent and U.S. Patent No. 7,086,537 ("the '537 Patent").  The Purolator Agreement requires Purolator to pay $325,000 and purchase filters exclusively from plaintiffs for $5.60 per unit.  Significantly, the '426 and '537 Patents are related to the '851 Patent in that they share the same parent (U.S. Patent No. 6,554,139) and thus the same disclosure.  However, both experts agree that this license is not probative of what a willing licensor and licensee would agree to because of litigation-driven motivations such as the "desire to avoid continued and costly litigation, as well as to avoid harm to reputation from an adverse judgment even if the risk of such a judgment is small."

Mr. Musika also discusses a license agreement between Parker-Hannifin Corp. and Parker Intangibles Inc. entered into January 1, 1989 (the "Parker Agreement").[9]  By this agreement, Parker-Hannifin was granted an exclusive license to various oil filter patents including the '851 Patent.  The Parker Agreement provides that Parker-Hannifin will pay "an amount equal to two percent (2%) of [Parker-Hannifin's] net sales to Customers."  Mr. Musika states that "the Parker Intangibles agreement does not represent an arms-length agreement.  It

---

[8] The Court recognizes that, for some of the licensing agreements it will discuss, only Parker-Hannifin - and not Parker Intangibles - was party to the agreement.  However, for the sake of convenience, the Court will simply indicate that "plaintiffs" were a party to each agreement.

[9] Parker Intangibles Inc. is the predecessor-in-interest to Parker Intangibles LLC, one of the plaintiffs along with Parker-Hannifin Corp. in this case.

19

was established by two interrelated companies for state tax purposes and is not reflective of the value of the '851 Patent."  Mr. Musika then concludes, without any further discussion, that "this [*Georgia-Pacific*] factor would have a neutral effect on the royalty rate."

Dr. Choi agrees that the Parker Agreement carries little probative value because it was "not an arm's length agreement."  However, Dr. Choi contends that the Court should look to several other licensing agreements between plaintiffs and others as evidence of what a reasonable royalty would be.

The first agreement relied upon by Dr. Choi is an agreement between plaintiffs and Hengst entered into November 7, 2001 (the "Hengst Agreement").  Plaintiffs were granted a license by Hengst to "manufacture certain oil filter assemblies."  The agreement covered eleven patents.  The royalty rate for the filter assemblies ranged from 4% to 7%, depending on the number of sales made.  The license was exclusive in some markets and nonexclusive in others. The Hengst Agreement explicitly provided that plaintiffs had no license to make or sell filter elements covered by Hengst's patents unless Hengst failed to meet Parker-Hannifin's requirements for three defined filter elements.  In such a case, Parker-Hannifin was required to pay a royalty of 5%.  Dr. Choi states that Mr. Musika's proposed rate is 635% more than that established under the Hengst Agreement.  Dr. Choi does not convert this 5% number to a per unit dollar value.  According to the Court's own calculations, it appears that this 5% royalty rate would amount to just more than $ 0.39 per unit.

Dr. Choi next points to an agreement between plaintiffs and a subsidiary of Ford Motor Company (the "Ford Agreement").  The license was for a "fuel control system for automotive applications."  The license was exclusive and entered into January 1, 2000.  It covered one patent

20

application.  Under the license, plaintiffs agreed to pay a 3.5% royalty on net sales of the licensed products.  According to Dr. Choi, Mr. Musika's proposed rate in this case is  eleven times greater than the rate agreed to in the Ford Agreement.  If that is the case, the rate under the Ford Agreement would amount to $ 0.23 per unit.

Dr. Choi next looks to an agreement between plaintiffs and a company named Oberg (the "Oberg Agreement").  The Oberg Agreement was directed to fluid filters.  Oberg granted the license to plaintiffs on November 13, 1992.  The license covers two United States patents as well as other foreign patents.  The royalty rate ranged from 9% to 5%, the rate decreasing in each year of the term of the agreement.  The license is exclusive.  Dr. Choi states that Mr. Musika's proposed rate is four to seven times greater than the rate negotiated under the Oberg Agreement.  This would equate to $ 0.36 to $ 0.62 per unit.

Finally, Dr. Choi relies upon a license from plaintiffs to Wix (the "Wix Agreement").  On February 1, 1998, plaintiffs granted to Wix a nonexclusive license to four patents and one patent application directed toward replacement filter elements.  Wix agreed to pay $1 per unit.

The Court acknowledges that the Hengst, Ford, Oberg and Wix Agreements do not cover the '851 Patent.  However, they are nonetheless instructive as they relate to engine filter technology.  Specifically, the Hengst Agreement establishes a rate for replacement filter elements of $ 0.39 per unit. The Oberg Agreement establishes a rate of $ 0.36 to $ 0.62.  And, the Wix Agreement establishes a rate of $1.00.  The Court has also considered the following:  the Oberg license appears to be the only exclusive license of those relied upon by Dr. Choi; the term of the Wix Agreement was only seven years; the Wix Agreement was entered into in 1998; and the Oberg Agreement was reached in 1992.  Even considering all of these factors, the Court

21

agrees with defendant that the evidence tends to support a lower royalty rate.

     2.       The rates paid by the licensee for the use of other comparable patents

The parties agree that defendant has procured no license to comparable patents. However, Mr. Musika opines that the Court should instead consider the price at which defendant purchased filters from plaintiffs before defendant began infringing.  Defendant was paying $7.97 per unit to plaintiffs.  The profit to plaintiffs was $2.89 per unit.  Mr. Musika opines that this factor would thus have a positive effect on the royalty rate.

Dr. Choi criticizes Mr. Musika's position.  He states that when defendant agreed to purchase from plaintiffs, it was "under different economic circumstances" and defendant had not commercialized its own product yet.  He points out that defendant chose to design its own filter - the "LP2017" - that did not infringe plaintiffs' then-issued patents.  After defendant introduced its filter to the market, plaintiffs obtained the '851 Patent, which covered defendant's LP2017 filter.  Defendant, in turn, designed a second filter - the Core Adapter - rather than purchase from plaintiffs at plaintiffs' "inflated" price.  Dr. Choi asserts that defendant had the manufacturing capability to make its non-infringing Core Adapter by the time the hypothetical negotiation would have taken place.  Dr. Choi also points to the fact that Wix, Baldwin and Purolator all decided to stop purchasing from plaintiffs and design their own filters.  He asserts that this "flight of customers" should be reflected in a lower royalty rate.

The Court has already found that defendant's Core Adapter was not and could not have been available as early as June 2005 - the date the hypothetical negotiation would have occurred. *See* Damages Opinion at 16-20.  However, the Court agrees with defendant that the parties to a hypothetical negotiation would have considered how easily, quickly and inexpensively a licensor

could design around the '851 Patent.  Because the evidence and arguments presented by defendant here are more relevant to factors 7 - 11, they will be discussed in more detail below. The Court finds that the only evidence probative of *Georgia-Pacific* Factor 2 is the price defendant paid to plaintiffs.  This evidence tends to support a higher royalty rate.

3.      The nature and scope of the license

This factor relates to whether the license would be exclusive or nonexclusive and whether it would be restricted as to geographical reach or to whom the licensed product may be sold.  Mr. Musika and Dr. Choi agree that any license granted would have been nonexclusive, and they agree that this factor would have a negative influence on the hypothetical royalty rate.

4.      The licensor's established policy to maintain his patent monopoly

This factor looks at whether the patentee has licensed the patent previously or granted licenses under conditions designed to preserve the patentee's monopoly.  Plaintiff was the only producer of oil filters for Ford 6.0 Liter diesel engines until the alleged infringers appeared on the market.  Mr. Musika and Dr. Choi agree that, since that time, plaintiffs have "aggressively sought to stop the sale of the alleged infringing product."  They also agree that this factor would tend to have a positive effect on the royalty rate.

5.      The commercial relationship between the licensor and licensee

The *Georgia-Pacific* case suggests that the royalty rate would be affected by whether the licensor and licensee are competitors or whether they are inventor and promoter.  Here, defendant was a customer of plaintiffs.  Defendant then introduced its infringing filter and began to compete directly with plaintiffs.  Mr. Musika opines that this factor would have a positive effect on the royalty rate.

23

Dr. Choi concedes that defendant's competition with plaintiffs would reduce plaintiffs' incentive to grant a license.  However, he states that this is mitigated by the fact that defendant would have entered the market with a non-infringing product in any event.  He concludes that this factor would have a neutral effect on the royalty rate.  But, he concedes that this factor would support a higher royalty rate if the defendant's Core Adapter were not available at the time of the hypothetical negotiation.  Defendant's non-infringing Core Adapter was not conceived of until October 2005.  The Court finds that this factor would support a higher royalty rate.

6.      The extent and effect of derivative and convoyed sales

Both experts agree that defendant did not use its infringing product to promote the sale of any other product.  Mr. Musika concedes that this factor would have a negative impact on the royalty rate while Dr. Choi states it would have a neutral effect.  The Court concludes it would have no effect.

7.      The duration of the patent and the term of the license

The '851 Patent will expire June 1, 2020.  Mr. Musika opines that "the significant remaining patent life is sufficient to prevent a licensee from foregoing a market entrance until patent expiration."  As a result, he concludes that this factor has a positive effect on the royalty rate.  Dr. Choi, on the other hand, states that "circumstances in an industry can shorten the economic life of the technology regardless of the remaining life of the patent."  He then points to the defendant's Core Adapter as evidence that defendant would not have required a license for the entire patent term or that any license would not have cost as much as it would have if defendant could not have quickly developed an alternative product.  He concludes this factor has

24

a neutral effect on the royalty rate.  The Court agrees with Dr. Choi that the parties would have considered how easily, quickly and inexpensively defendant could have developed its own non-infringing product.  This factor has a neutral effect on the royalty rate.

        8.      <u>The established profitability of the product made under the patent</u>

Mr. Musika relies on defendant's profit from its infringing filters in concluding that this factor has a positive effect on the royalty rate.  Defendant's operating profit margin for its infringing product was 53.10%.  Dr. Choi concedes that a licensee would be willing to pay more for a license if selling under a license is more profitable than selling one's own product.  In fact, he points out that defendant's profit on its Core Adapter is less than the profit it earned when selling plaintiffs' filters.

On the other hand, Dr. Choi states that the Court should consider that defendant would not have been willing to pay more than $86,500 to obtain a license.  Defendant also argues that there is no nexus between the patented features and the filter's commercial success.  Defendant relies on the success of its non-infringing Core Adapter in support of its position.

While the Court agrees with defendant that there is no evidence that the patented features contribute to profitability, the fact remains that these filters at issue are very profitable for both plaintiffs and defendant.  This factor would have a positive effect on the royalty rate.  The nexus between the patent and the commercial product is best dealt with under Factors 9, 10 and 13, below.

        9.      <u>The utility and advantages of the patent property over the old devices</u>

Mr. Musika states that the patented invention prevents an improper filter element from being used and prevents operation of the filter without an element in place.  He also states that

the invention reduces or eliminates the potential mess and environmental issues associated with a filter element change.  He points to no evidence of these alleged benefits.  He relies solely on the statements made by the inventors in the patent specification.

Dr. Choi again states that the parties would have considered whether defendant could design its own product to provide the alleged benefits of the '851 Patent.  However, he concedes that, assuming the Core Adapter was not available at the time of the hypothetical negotiation, this factor supports a higher royalty rate.

Given plaintiffs' lack of *evidence* that consumers purchase plaintiffs' filter because of the patented features, the Court finds that this factor would have no effect on the negotiated royalty.[10]

10.    <u>The nature of the patented invention and the benefits to consumers</u>

Mr. Musika and Dr. Choi both rely on the same statements made regarding Factor 9.  Thus, the Court finds that this factor has no effect on the royalty rate.

11.    <u>The extent to which the infringer has made use of the invention</u>

Mr.Musika states that defendant has used the invention extensively - it sold hundreds of thousands of infringing filters and those filters embodied the patented invention.  Dr. Choi argues, again, that defendant could have entered the market without using the invention at all.

---

[10]

> There is no evidence that "demand" for the patented filter was created by any customer need or desire.  Rather, it appears that plaintiffs manufactured this demand through their agreement with Ford and others that the Ford 6.0 L engine would be manufactured to only accept plaintiffs' filter.  Thus, consumers do not appear to be buying the patented filter because they like its benefits or features.  They are buying it because it is the only filter that will fit their truck engine.

26

But, the fact remains that defendant did use the invention.  This factor would tend to support a higher royalty rate.

         12.      <u>The portion of profit or selling price that is customary to use the invention</u>

Both experts agree that there is no customary price to allow for use of the invention in the relevant market.  This factor would have no effect on the royalty rate.

         13.      <u>The portion of the realizable profit that should be credited to the invention</u>

Mr. Musika contends that "the entire market for the Champion LP2017 oil filter was created by the new Parker-Racor filter design which incorporates the technology covered by the '851 Patent."  However, he also recognizes that defendant "bears the business risk in securing customer relationships, securing working capital, maintaining its production equipment and managing product inventory.  It follows that Parker's expected profit would be less if it were to off-load a portion of its business risk through licensing the production of the filters to Champion."  Mr. Musika concludes that this factor would have a negative impact on the royalty rate.  Dr. Choi agrees and adds that the commercial success of the Core Adapter is evidence that the '851 Patent accounts for only a small portion of the desirability of the filter.

For these reasons and the reasons discussed in connection with Factor 9 above, the Court finds that this factor would have a negative impact on the negotiated royalty rate.

         14.      <u>The opinion testimony of qualified experts</u>

Both experts state they have consulted the technical opinion of Dr. Garris.  The parties agree this factor has no influence on the royalty rate.

         15.      <u>The amount that the licensor and licensee would have agreed upon</u>

This factor is a culmination of the 14 factors discussed above.  Mr. Musika states that he

looked at the parties' reference points of $1.48 for defendant and $2.89 for plaintiffs.  The midpoint between these points is $2.185.  Because he found that eight factors were in favor of a higher rate and only three in favor of a lower rate, he decided the analysis supported a higher rate.  He took the midpoint between $2.185 and $2.89.  The result was $2.5375.  He rounded this result down to $2.50.  In Mr. Musika's opinion, the most significant factors supporting a higher rate are the market created by plaintiffs for the filter and the established rate paid by defendant to plaintiffs before infringement began.  The Court has already stated that it does not believe that the market created by the plaintiffs deserves much weight.  The primary factor supporting a lower rate, according to Mr. Musika, was the business risk to defendant associated with taking on production of its own filter.

Dr. Choi, of course, states that defendant's initial reference point would have been $ 0.27 per unit and they would have paid no more than $86,500.  Dr. Choi also states that "there is no evidence to support that Champion would stand to gain an excess profit over its next-best alternative."  However, he admits that the Core Adapter is less profitable than defendant's infringing product was.  Further, Dr. Choi admits that "a potential licensor would accept no less than the incremental amount of money it realistically stands to lose from granting a license for the patent-in-suit."  Nonetheless, he complains that Mr. Musika's rate equates to 37.3% of defendant's net sales and 60% of defendant's gross profits.  The most important fact according to Dr. Choi is that defendant developed a non-infringing alternative for only $86,500.

In sum, the royalty rate would have been somewhere between $ 0.27 and $2.89 per unit.  However, as stated above, because Dr. Choi fails to explain how he arrived at $ 0.27 as the royalty rate, the Court feels $ 0.85 per unit - the cost per unit to develop a non-infringing

28

alternative - is a better reference point.  Five of the factors point toward a higher royalty rate and three point toward a lower rate.  Six of the factors are neutral or would have no effect.

The hypothetical negotiation is designed to determine what would adequately compensate *the patentee*.  As the Federal Circuit has so aptly stated:

> Although an infringer's anticipated profit from use of the patented invention is among the factors to be considered in determining a reasonable royalty, the law does not require that an infringer be permitted to make a profit.  And, where, as here, a patentee is unwilling to grant an unlimited license, the hypothetical negotiation process has its limits.  As we explained in *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320 (Fed. Cir. 1987), the "imposition on a patent owner who would not have licensed his invention for [a given] royalty is a form of compulsory license, against the will and interest of the person wronged, in favor of the wrongdoer." *Id.* at 1328; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) ("The hypothetical negotiation is often referred to as a 'willing licensor/willing licensee' negotiation. However, this is an inaccurate, and even absurd, characterization when, as here, the patentee does not wish to grant a license.").

*Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed. Cir. 2004).

The Court concludes that, given all of the relevant evidence, the parties would have agreed to a royalty rate of $2.00 per unit.  The midpoint between $ 0.85 and $2.89 is $1.87.  The Court finds that the parties would have agreed to a rate slightly above this midpoint.  This is based on the fact that there were more factors that supported a higher rate than those that supported a lower rate.  Of those factors that supported a lower rate, the Court finds the licensing of other patents most probative.  Those licenses provided for royalties in the range of $ 0.36 to $1.00 per unit.  Also probative is what defendant would have spent to design around the patent and launch its own non-infringing product and how quickly that design could be implemented.  Defendant spent $86,500 to do this work, or $ 0.85 per unit.  Of those factors that supported a

29

higher rate, the Court looks to plaintiffs' steadfast enforcement of its patent monopoly and refusal to license to others.  Further, the '851 Patent had 15 years left on its term when the hypothetical negotiation would have taken place, and plaintiffs were earning $2.89 per filter by selling to defendant.

Defendant sold 101,762 infringing units during the provisional rights period. Multiplying 101,762 by $2.00, this amounts to a total damages award for the provisional rights period of $203,524.

**CONCLUSION**

For the foregoing reasons, defendant's motion for clarification and reconsideration is GRANTED in PART and DENIED in PART.  Plaintiffs' motion to strike is GRANTED. Defendant is ordered to submit within ten days of issuance of this Order a calculation of the simple interest for each damages period at the rate provided for in Ohio Rev. Code § 5703.47 including a statement of (1) the number of infringing units sold per year during both the Provisional Rights Period and the Infringement Period; (2) the interest rate used; and (3) the basis for determining that interest rate.

The Court's earlier Damages Opinion (Doc. 53) is also hereby modified.  Plaintiffs are awarded a reasonable royalty for the provisional rights period in the amount of $203,524.

IT IS SO ORDERED.


  /s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
Date:   8/04/08                    United States District Judge

30